Victoria **RACHEL–SMITH**

v.

**FTDATA, INC.**

No. CIV.A. DKC 2001–3707.

United States District Court, D. Maryland.

Feb. 13, 2003.

736

Robert Scott Oswald, Noto and Oswald PC, Washington, DC, for Plaintiff.

Elena D. Marcuss, McGuire Woods LLP, Baltimore, MD, Christina Volzer Bailey, John J. Michels, Jr., McGuire Woods LLP, McLean, VA, for Defendant.

## MEMORANDUM OPINION

CHASANOW, District Judge.

Presently pending and ready for resolution in this sexual harassment case are: (1) Defendant's Motion to Strike and for Sanctions and Costs; (2) Plaintiff's Motion to Strike Defendant's Motion for Summary Judgment on Plaintiff's Amended Complaint; (3) Defendant's Motion for Leave to File Motion for Summary Judgment on Plaintiff's Amended Complaint; (4) Defendant's Motion for Summary Judgment on Plaintiff's Amended Complaint (incorporating Defendant's original Motion for Summary Judgment); and (5) Plaintiff's Motion to Strike Defendant's Affirmative Defense. The issues have been fully briefed and no hearing is deemed necessary. Local Rule 105.6. For the reasons that follow, the court shall: (1) grant in part and deny in part Defendant's motion to strike and for sanctions and costs; (2) deny Plaintiff's motion to strike Defendant's motion for summary judgment on Plaintiff's amended complaint; (3) grant Defendant's motion for leave to file summary judgment motion on Plaintiff's amended complaint; (4) grant Defendant's motion for summary judgment as to count I (claims brought under the Prince George's County Code), the retaliation claim under count II (Title VII claims), count III (assault), and count IV (wrongful discharge/prostitution); (5) deny Defendant's motion for summary judgment as to the *quid pro quo* and hostile work environment sexual harassment claims under count II; and (6) deny Plaintiff's motion to strike Defendant's affirmative defense.

## I. Defendant's Motion to Strike and for Sanctions and Costs.

### A. Background

In a letter to Plaintiff's counsel on February 20, 2002, FTData requested an Independent Medical Examination (IME) of Plaintiff. Plaintiff responded that she would let FTData know by February 25, 2002 whether she intended to seek damages beyond "garden variety" emotional distress and therefore whether a Rule 35 IME would even be necessary. FTData did not hear from Plaintiff by the appointed date and Plaintiff did not return FTData's phone calls.

On February 27, 2002, FTData filed a motion seeking an order requiring examination of Plaintiff pursuant to Fed.R.Civ.P. 35. In response, Plaintiff sent FTData a letter on March 11, 2002, outlining terms on which she would agree to an IME and filed her opposition to FTData's motion on March 14, 2002. FTData offered a counter-proposal in the reply brief it filed on March 29, 2002. On April 17, 2002, the court issued an order requiring Plaintiff to submit to an IME to be conducted by Dr. Brian Schulman. The court's order included instructions that the examination be conducted, "on date and at time as shall be agreed upon by counsel," "as is normally done by Dr. Schulman," and that "Plaintiff may audiotape the discussions held during the examination so long as said taping does not materially interfere with the examination." Paper 21.

Through correspondence and telephone calls, counsel for the parties set May 31, 2002 as the date for the IME. On May 14, 2002, Plaintiff requested that a microphone be set up in Dr. Schulman's office to transmit the IME conversation to a recording device outside the examination room that would be monitored by a court reporter who would later transcribe the tape. FTData consulted Dr. Schulman and advised Plaintiff that Dr. Schulman felt that the proposed audio-taping monitored by a court reporter would materially interfere with his ability to conduct the examination but that he would agree to allow Plaintiff

to bring a tape recorder with her and personally record the session herself.

On May 21, 2002, Plaintiff informed FTData that she intended to file a motion to disqualify Dr. Schulman because he would not agree to the recording and monitoring of the IME. On May 22, 2002, FTData contacted Magistrate Judge Day's chambers to ask if there were a way to resolve the issue quickly. Judge Day's law clerk attempted to conference Plaintiff's counsel in on the telephone call to advise the parties of the manner in which Judge Day would like the issue to be brought before him for resolution. Plaintiff's counsel could not be reached, however, so the conference call was scheduled for the next morning.

On the morning of May 23, 2002, Plaintiff faxed her Motion for Clarification to FTData and Judge Day's chambers. Judge Day conducted the telephone conference after having a chance to review Plaintiff's motion and ruled that Plaintiff was permitted to tape record the IME by bringing an unobtrusive recording device into the examination area, but no technician could be involved in the tape recording of the IME. Paper 38.

On May 28, 2002, Plaintiff advised FTData that she would not appear for the IME on May 31, 2002. FTData objected that Judge Day's order was in place and that Plaintiff was expected to appear for the IME on May 31, 2001. FTData also informed Plaintiff that she would be responsible for paying Dr. Schulman's $500 cancellation fee if she did not appear for the IME on May 31, 2002. Plaintiff responded that she would not pay the fee. Plaintiff did not appear for the IME on May 31, 2002 and did not file a motion for protective order or a motion to stay.

Plaintiff did, however, file a Rule 72 objection to Judge Day's order of May 28, 2002.[1] FTData filed its motion to strike pursuant to Rule 37(b) on May 31, 2002.

### B. Analysis

Defendant argues that because Plaintiff did not appear for the IME with Dr. Schulman on May 31, 2002, she disobeyed a court order for examination pursuant to Rule 35(a).[2] Rule 37(b) governs sanctions that may be imposed on parties who fail to comply with court orders under Rule 35(a) and allows a court, in its discretion, to make the following orders:

(A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence;

(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;

· · · · ·

In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or

---

1. The court denied Plaintiff's motion to disregard the May 23, 2002 Order of Judge Day in an order on August 15, 2002. Paper 73.

2. The IME of Plaintiff was conducted by Dr. Schulman on August 27, 2002.

that other circumstances make an award of expenses unjust.

Defendant asks the court to strike Plaintiff's claim for damages for alleged mental, psychological, and emotional damages and to require Plaintiff to pay FTData's expenses and attorney's fees and the $500 cancellation fee incurred as a result of Plaintiff's failure to appear for the court-ordered IME.

Plaintiff disputes that she disobeyed the court's order for an examination. Plaintiff points out that Judge Day's Order of April 17, 2002 does not by its terms impose a particular deadline or date for Plaintiff's IME; instead, the Order leaves it to the discretion of the parties to agree upon a date for the examination. Because negotiations over the manner in which the recording of the IME could take place were ongoing, Plaintiff argues that the parties were never in full agreement or, in the alternative, that Plaintiff's May 28, 2002 notice to Defendant that she would not be appearing for the IME on May 31, 2002 voided any agreement the parties may have come to regarding the date and time of the IME.

Based on a review of the materials submitted as exhibits documenting the communications between Plaintiff, Defendant, and the court, it is clear that the parties had, by May 14, 2002, reached agreement on the *date and time* that the IME would take place. See Paper 46, Exhibit I. What the parties had not reached agreement on, however, was the *manner* in which the recording of the IME would take place. Regarding this, Judge Day's Order of April 17, 2002 specified that the examination "shall be conducted as is normally done by Dr. Schulman. . . . Plaintiff may audiotape the discussions held during the examination so long as said taping does not materially interfere with the examination." Paper 21. The parties had difficulty agreeing on an interpretation of this

portion of the April 17, 2002 Order and on May 22 and 23, 2002, the parties contacted Judge Day's chambers in their efforts to clarify the court's Order. As a result, Judge Day issued an Order on May 23, 2002 clearly instructing that an unobtrusive tape recording device may be used during the IME but that there would be no technician to monitor the examination, no transmission from inside the examination room to the outside, and anyone who might set up the tape recording device would need to leave the examination area during the course of the examination. Plaintiff then exercised her right to file an objection to Judge Day's Order and notified Defendant on May 28, 2002 that she would not appear for the scheduled IME, however, Plaintiff did not file any motion to stay or extend the time for the IME.

The court finds that Plaintiff did technically disobey the court's order by not appearing for the May 31, 2002 IME—even if disputes over the audio-taping of the IME were ongoing at the time. According to the plain language of Rule 37(b)(2), the court shall require the disobedient party to pay reasonable expenses caused by the failure, including attorney's fees, "unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust." Given the number and types of discovery disputes—many of them *de minimis*—that have occurred over the course of the present litigation, an award of fees here would be unjust. Plaintiff will therefore not be required to pay Defendant's attorney's fees and costs for the filing of the motion for sanctions.

The only obvious prejudice caused to Defendant by Plaintiff's failure to appear for the examination or formally to move to stay the May 31, 2002 IME is the liability for the $500 cancellation fee to Dr. Schulman. Upon receiving Plaintiff's letter on

May 28, 2002 declaring that she would not appear for the May 31, 2002 examination, Defendant notified Plaintiff that Dr. Schulman would charge a $500 cancellation fee if Plaintiff failed to appear on the appointed date. On May 31, 2002, Dr. Schulman wrote to Defendant's counsel to advise that Plaintiff had not shown up for the examination and submitted to Defendant's counsel a bill for the $500 cancellation fee. Paper 46, Ex. O. Plaintiff will therefore be required to pay the $500 cancellation fee to Dr. Schulman, however, Defendant's motion to strike Plaintiff's claim for damages for alleged mental, psychological, and emotional damages will be denied as measures disproportionate to the prejudice that it suffered.

## II. Plaintiff's Motion to Strike Defendant's Motion for Summary Judgment and Defendant's Motion for Leave to File Motion for Summary Judgment on Plaintiff's Amended Complaint.

### A. Background

The court's Scheduling Order set May 5, 2002 as the deadline for the filing of all dispositive motions. Defendant moved to extend that deadline to thirty days after the court's ruling on Defendant's Motion to Dismiss. The court granted the motion and ruled on Defendant's Motion to Dismiss on May 9, 2002. The new dispositive motions deadline thus became June 10, 2002 and Defendant filed its original Motion for Summary Judgment on June 7, 2002. In the meantime, Plaintiff filed a motion for leave to file an amended complaint on May 13, 2002, which the court granted on August 15, 2002. Plaintiff's amended complaint re-pleads the assault claim dismissed on May 9, 2002 on a new theory. After a short period during which additional discovery ordered by the court took place, Defendant filed a motion for summary judgment on Plaintiff's amended complaint that incorporated the original motion for summary judgment filed in June and added a response to Plaintiff's re-pled assault claim. On October 4, 2002, Plaintiff filed her motion to strike Defendant's motion for summary judgment on the amended complaint. Defendant then filed its motion for leave to file motion for summary judgment on the amended complaint on October 11, 2002.

### B. Analysis

In her response to Defendant's motion for leave to file, Plaintiff states,

Plaintiff does not, as Defendant asserts, claim that Defendant should be time barred from filing any dispositive motion, but rather that Defendant should be held to the same standard expected of all practitioners before this Court when it comes to procedural matters. . . .

Thus, to the extent that this Court should find that Defendant's Motion for Leave filed subsequent to her dispositive motion is sufficient to meets its obligation under the Rules of this Court, Plaintiff does not oppose Defendant's instant motion.

Paper 97, at 2. Defendant has filed a motion for leave to file its motion for summary judgment on Plaintiff's amended complaint. The court is satisfied that Defendant has taken the appropriate procedural steps in the submission of its motion for summary judgment on the amended complaint. Defendant's motion will therefore be granted and Plaintiff's motion to strike will be denied.

## III. Defendant's Motion for Summary Judgment on Plaintiff's Amended Complaint.

### A. Background

The following facts are alleged by Plaintiff. On or about December 13, 1999,

Plaintiff Victoria Rachel–Smith began her employment as a sales person with Defendant FTData, Inc., a Maryland corporation. Plaintiff's duties were to generate sales for FTData and she reported directly to FTData's General Manager, Frank McLallen (McLallen).

Beginning in or about March 2000, McLallen would summon Plaintiff into his office, ask her to close the door, and attempt to engage her in conversations about sexual topics. On several occasions, sometimes in the presence of others, McLallen would make sexually explicit comments to Plaintiff, at least once making reference to his genitalia and his likely inability "to satisfy" Plaintiff.

Subsequently, McLallen began to make both physical and verbal sexual advances to Plaintiff. In or about June 2000, on the way to a work-related seminar, McLallen was driving and placed his hand on Plaintiff's thigh until she removed it. Later that month, McLallen requested that Plaintiff meet him early one morning outside the office to assist him in preparing for a client meeting. At this meeting, McLallen told Plaintiff that if she were his wife, she would be able to stay home and relax and told her he wanted to take care of her.

Later that month, on or about June 20, 2000, McLallen summoned Plaintiff to his office, where he informed her that he was attracted to her and that all that was required of her to be happy in her job was to ensure that he was happy. Immediately thereafter, McLallen kissed Plaintiff on the mouth. Frightened by this overture and fearing for her job, Plaintiff submitted to the kiss. On several occasions over the next several weeks, McLallen summoned Plaintiff into his office ostensibly for work-related purposes but then accosted her and attempted to force her to submit to his sexual advances. On another occasion, McLallen attempted to reach under her skirt, but Plaintiff stopped him. On at least one other occasion, McLallen touched her thigh while she was sitting at her workstation, and attempted to reach higher before she stopped him. McLallen again summoned Plaintiff into his office on or about June 21, 2000, and informed her that if she did as he asked in pleasing him and making him happy, they could take two-hour lunches and she could have money to buy whatever she wanted.

On June 26, 2000, McLallen sent Plaintiff an email requesting that she stay late that night to discuss some work-related issue. Plaintiff refused to stay late, declining via email, because she feared another sexual encounter. In that email, Plaintiff informed McLallen of her desire to cease all kissing and other sexual episodes with him. When Plaintiff refused McLallen's advances, he responded that he "didn't want to put [her] in this position," but that he "could convince [her] if [he] wanted to." Complaint, at ¶ 14. Plaintiff interpreted McLallen's response as a threat which he allegedly fulfilled on July 11, 2000, when Plaintiff was placed on probation for several alleged "violations of her employment." Complaint, at ¶ 15. At the same time, she was transferred off-site, to the office of FTData's customer, PG & E Corporation. Plaintiff protested her probation and transfer and submitted a letter in response, alleging that her treatment was unfair.

The last alleged assault occurred on August 1, 2000, when Plaintiff and McLallen were in the basement together for the purpose of retrieving a television set. McLallen chased Plaintiff around the television, attempting physically to accost her. Plaintiff protested verbally and physically and, after missing the elevator three times, she successfully prevented any further accosting by getting on the elevator with the television. Following this alleged assault,

in the Fall of 2000, Plaintiff formally complained to her employer about McLallen's treatment of her. The company launched what Plaintiff characterizes as a cursory investigation.

On or about December 18, 2000, Plaintiff made a complaint to the Maryland Commission on Human Relations which cross-filed her claims with the United States Equal Employment Opportunity Commission ("EEOC"). Plaintiff asserts in her amended complaint on information and belief, that the EEOC then cross-filed her claims with the Prince George's County Human Rights Commission ("PGCHRC"). (There is no evidence, however, to support that assertion.) In December 2000, the President of FTData, without Plaintiff's knowledge or consent, offered Plaintiff's continued services to the out-sourcing company after the expiration of her initial contract with them. The out-sourcing company renewed its contract with FTData for short-term periods through the middle of March, 2001. On or about February 1, 2001, Plaintiff was informed that the out-sourcing contract would not be renewed at the end of the then current six week term and that she would be terminated by FTData. The proffered reason for Plaintiff's termination was that there was no more work for her to perform, although she was aware of at least one vacancy for which she was qualified. Plaintiff was never given the opportunity to apply for any vacancies and her last day of work was April 6, 2001.

Plaintiff received a Notice of Right to Sue letter from the EEOC on or about July 24, 2001. Subsequently, Plaintiff filed a lawsuit in Maryland state court which was removed to this court on November 29, 2001. In May 2002, the court dismissed Plaintiff's negligent hire/retention and assault claims from her original complaint. Plaintiff re-pled her assault claim in an Amended Complaint. Pursuant to Fed.R.Civ.P. 56, FTData now moves for summary judgment on Count I (Prince George's County Human Rights Act), Counts I and II (sex discrimination claims brought under the Prince George's County Code and Title VII), Count III (amended Assault claim), and Count IV (Wrongful Discharge/Prostitution) of the amended complaint.

## B. Standard of Review

It is well established that a court may grant a motion for summary judgment only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir.1985); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir.1979). A material fact is one that constitutes an element that is essential to a party's case. *Celotex v. Catrett*, 477 U.S. at 322–23, 106 S.Ct. 2548. As the Supreme Court stated in *Anderson*, "... the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." 477 U.S. at 248, 106 S.Ct. 2505.

A genuine issue as to a material fact exists if the evidence that the parties present to the court is sufficient to indicate the existence of a factual dispute that could be resolved in the non-moving party's favor through trial. *See Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505. While it is the movant's burden to show the absence of a genuine issue of material fact, *Pulliam Investment Co., Inc. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987), it is the

non-moving party's burden to establish its existence. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The evidence that the non-moving party presents to this end must be more than a "mere scintilla," *Barwick v. Celotex Corp.,* 736 F.2d 946, 958–59 (4th Cir.1984), more than "merely colorable," *Celotex v. Catrett,* 477 U.S. at 327, 106 S.Ct. 2548, and more than "some metaphysical doubt." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. In order for the non-moving party to survive summary judgment, it must present evidence that is "significantly probative." *Celotex v. Catrett,* 477 U.S. at 327, 106 S.Ct. 2548.

Applying these principles, Defendant's motion for summary judgment shall be considered below while the inferences that the court draws from the facts and evidence presented shall be viewed "in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *see also Matsushita,* 475 U.S. at 587–88, 106 S.Ct. 1348; *Pulliam,* 810 F.2d at 1286; *Gill,* 773 F.2d at 595.

### C. Analysis

#### 1. Claim Under the Prince George's County Code (Count I)

Plaintiff attempts to bring a claim in Count I for a violation of § 2–222 of the Prince George's County Code which prohibits employers from making decisions about hiring, termination, or the conditions of employment based on discrimination. In its motion to dismiss, FTData contended that Count I should be dismissed for failure to exhaust administrative remedies because Plaintiff never filed a charge with the PGCHRC. In deciding that motion, the court found that it was premature at that time to resolve the question of whether Plaintiff was qualified to bring a claim under the Prince George's County Code.

The court denied FTData's motion without prejudice and specifically noted that the issue could be revisited on a motion for summary judgment. FTData has chosen to raise this issue again in its motion for summary judgment and the parties have briefed this issue again. Plaintiff argues that any failure on her part to file with the PGCHRC should be excused because she made a good faith effort to comply and allegedly believed the claim would be cross-filed with the PGCHRC when she filed it with the Maryland Commission on Human Relations.

Prince George's County is authorized to provide a private right of action by Maryland Code, Art. 49B § 42(a). However, the Maryland Code places certain restrictions on when an action may be brought, including a requirement in § 42(c) that an action, "may not be commenced sooner than 45 days after the aggrieved person files a complaint with the county agency responsible for handling violations of the county discrimination laws." It is undisputed that Plaintiff never directly filed a charge with the PGCHRC, the county agency responsible for handling such violations. The claim Plaintiff filed with the Maryland Commission on Human Relations was cross-filed with the EEOC in Baltimore which she allegedly believed would then cross-file it with the PGHRC pursuant to its designation as a Notice Agency in 29 C.F.R. § 1601.74 and the Work Sharing Agreement between the EEOC and the PGCHRC.

Plaintiff claims that she was "justified in her good faith belief that having her complaint timely filed with the Maryland Commission on Human Relations would result in her complaint being automatically cross-filed with the EEOC, and then pursuant to the [Work Sharing] Agreement, cross-filed with the PGCHRC." Paper 60, at 5. Plaintiff essentially argues that her ignorance of the fact that the EEOC did not cross-file

with the PGCHRC is reasonable—i.e., that a reasonable person exercising due diligence would have assumed the EEOC would automatically cross-file with the PGCHRC. In support of this contention, Plaintiff points to language in the Work Sharing Agreement between the EEOC and PGCHRC, Plaintiff and her counsel's good faith belief that her claim would be cross-filed with the PGCHRC, and the fact that it is general practice for the EEOC to cross-file any charge received with the local agency.

As Plaintiff points out, the Work Sharing Agreement does in fact designate the PGCHRC as *"the FEPA"* (Fair Employment Practices Agency) and no other agency is covered by this definition within the four-corners of this Agreement. This is hardly noteworthy, however, given that the only parties to this particular Agreement are the EEOC and the PGCHRC. The question remains as to whether it was reasonable for Plaintiff to believe that filing her claim with the Maryland Human Relations Commission would trigger a chain of cross-filing that would result in her charge being filed with the EEOC and then re-cross-filed with the PGCHRC. Plaintiff refers to 29 C.F.R. § 1601.70(d) for the proposition that it is general practice for the EEOC to cross-file any charge received with the local agency pursuant to their Work Sharing Agreement. The sentence Plaintiff cites to hardly provides strong support for Plaintiff's proposition that the EEOC would cross-file with the PGCHRC as a matter of course. ("However, where there exist agencies of concurrent jurisdiction, the Commission may defer to the FEP agency which would best

serve the purposes of title VII or the ADA, or to both.") Furthermore, the first sentence of § 1601.70(d) states, "[w]here both State and local FEP agencies exist, the Commission reserves the right to defer to the State FEP agency only." This would seem to indicate to any reasonable person exercising due diligence that a referral to the PGCHRC, the local FEPA, would not be automatic after a claim had *already* been filed with the Maryland Human Relations Commission, the state FEPA, and then cross-filed with the EEOC. Finally, both Plaintiff's claim that she was under the good faith belief that her complaint would be automatically cross-filed with the PGCHRC, and her counsel's sworn claim to the same effect, have no bearing on the question presented to the court. The *subjective* good faith belief of Plaintiff and her counsel are irrelevant to the inquiry of the *objective* reasonableness of that belief.

Given the evidence presented, the court finds that a reasonable person exercising due diligence would not have expected that a claim filed with the state FEPA would automatically be cross-filed with the local FEPA, via cross-filing through the EEOC—i.e., Plaintiff was not justified in her belief that her claim would be cross-filed with the PGCHRC. Defendant's motion will therefore be granted and Plaintiff's employment discrimination claims brought pursuant to the Prince George's County Code will be dismissed.

### 2. Claims Under Title VII (Count II) [3]

Plaintiff brings claims of *quid pro quo* sexual harassment, retaliation, and hostile work environment sexual harassment against Defendant.[4] It is Plaintiff's bur-

---

**3.** Defendant's motion seeks summary judgment on the discrimination claims brought under both the Prince George's County Code (count I) and Title VII (count II). Because the court will grant Defendant's motion for summary judgment on count I on other

grounds, only the Title VII claims will be considered.

**4.** Defendant asks the court to prohibit Plaintiff from advancing her *quid pro quo* sexual harassment and retaliation claims because

den to establish a *prima facie* case for her claims of discrimination. Under the *McDonnell Douglas* burden shifting scheme, once a plaintiff has established a *prima facie* case of discrimination, it is the employer's burden to rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for its actions. The employer meets its burden if it can produce evidence that is legally sufficient to justify judgment in its favor. If the employer meets its burden, the plaintiff must show by a preponderance of the evidence that the reason proffered by the employer was not the true reason for the employer's adverse action but only a pretext for discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

FTData seeks summary judgment on all of Plaintiff's Title VII claims because Plaintiff has failed to establish *prima facie* cases under all of the theories. The court will address each claim in turn.

### a. Quid Pro Quo Sexual Harassment

 Under Title VII, it is unlawful for an employer "to discriminate against an individual with respect to ... terms, conditions, or privileges of employment because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). Sexual harassment represents one form of this prohibited sex discrimination. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct.

2399, 91 L.Ed.2d 49 (1986). There are two categories of sexual harassment that are generally recognized: harassment that creates an offensive or hostile work environment and *quid pro quo* sexual harassment, where sexual consideration is demanded in exchange for job benefits. *Katz v. Dole,* 709 F.2d 251, 254 (4th Cir. 1983).

In order to establish a *prima facie* case of *quid pro quo* sexual harassment, Plaintiff must show that: (1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) Plaintiff's reaction to the harassment affected tangible aspects of compensation, terms, conditions, or privileges of employment; and (5) the employer knew or should have known of the harassment and took no effective remedial action. *Spencer v. General Electric,* 894 F.2d 651, 658 (4th Cir.1990), *overruled on other grounds by Farrar v. Hobby,* 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992).

Plaintiff has satisfied the first, second, third, and fifth elements of a *quid pro quo* harassment claim. She has established that, as a woman, she is a member of a protected class, she was subject to sexual harassment that was unwelcome, and the harassment she complains of was based on sex. Furthermore, because the harassment was being committed by Frank McLallen (McLallen), one of FTData's supervisors, the fifth element is automatically satisfied because, under 42 U.S.C.

Plaintiff's complaint has not provided fair notice of her intention to bring her Title VII claims on those theories. In *Swierkiewicz v. Sorema,* 534 U.S. 506, 512, 122 S.Ct. 992, 997–98, 152 L.Ed.2d 1 (2002), the Supreme Court noted that "[b]efore discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation of the required *prima facie* case in a particular case ...." The Court then went on to state

that "[t]his simplified notice pleading standard [of Rule 8(a)(2)] relies on liberal discovery rules and summary judgment motions to define disputed facts and issues ...." *Id.* Here, Defendant's summary judgment motion has served the very purpose of helping to define the precise formulation of Plaintiff's Title VII claims. Plaintiff will therefore be permitted to advance her *quid pro quo* harassment and retaliation claims.

§ 2000e(b), knowledge of the harassment is imputed to the employer through its agent-supervisor. *Spencer,* 894 F.2d at 658, n. 10.

Defendant only disputes whether Plaintiff has satisfied the fourth element of the *prima facie* case for *quid pro quo* harassment—i.e., whether Plaintiff's reaction to the harassment affected tangible aspects of compensation, terms, conditions, or privileges of her employment. Plaintiff claims that she rejected McLallen's advances and submits a copy of an e-mail message from June 28, 2000 that she sent McLallen as documentation of this rejection. Plaintiff claims that as a result of this rejection, she was placed on a 30–day probation period and then transferred to work for PG & E. Plaintiff argues that both the placement on probation and the transfer were adverse employment actions that had an effect on tangible aspects of compensation, terms, conditions, or privileges of her employment. Specifically, Plaintiff claims that the transfer to PG & E was an effective demotion because that job involved substantially reduced duties, diminished long-term employment and promotion opportunities, increased risk of termination, reduced client contact, and offered no opportunity to earn sales commissions.

Defendant maintains that Plaintiff was placed on probation as a result of performance problems that predated and were wholly unrelated to the dynamics of her relationship with McLallen and that the probation did not negatively affect her salary, benefits, or her hours worked. Defendant also argues that Plaintiff's reassignment was not an adverse employment action because Plaintiff was consulted about the transfer and did not object, Plaintiff rarely earned commissions anyway, and that Plaintiff's duties and responsibilities at the PG & E position were not diminished. Furthermore, Defendant argues that FTData began terminating employees, including its entire outside sales staff, as part of its reduction in force (RIF) in January 2001 and that Plaintiff's transfer actually spared her from this first round of terminations.

To the extent that Plaintiff's performance was to be reviewed on a weekly basis while she was placed on probation and "lack of performance or meeting objectives during this period [would] be considered grounds for dismissal", Paper 60, Ex. 1, Tab 4, Plaintiff's placement on probation may be considered an employment action that adversely affected the conditions of Plaintiff's employment. *See Lewis v. Forest Pharmaceuticals, Inc.,* 217 F.Supp.2d 638, 648 (D.Md.2002) (finding the issuance of a reprimand that merely threatened probation as a consequence of unmended ways qualified as a tangible employment action). FTData disputes that Plaintiff was placed on probation as a result of her rejection of McLallen's advances. However, "[a]n inference of causation arises if the unwelcome sexual advances proximately preceded the tangible employment action and the alleged harasser made or substantially influenced the relevant decisions." *Lewis,* 217 F.Supp.2d at 648–49 (citing *Dowe v. Total Action Against Poverty in Roanoke Valley,* 145 F.3d 653, 657 (4th Cir.1998)). Plaintiff was notified that she had been placed on probation in a letter from McLallen dated July 11, 2000, approximately two weeks after she had sent McLallen the e-mail rebuffing his suggestions and advances. FTData asserts, however, that it was on the suggestion of Juretta Gonzales (Gonzales), the Human Resources and Accounting Manager at FTData, that McLallen placed Plaintiff on probation, that Gonzales did not know about the interactions between McLallen and Plaintiff, and that she made the suggestion based on Plaintiff's past performance problems. Paper 68 at 12 and Ex. I. Gonzales's input on

Plaintiff's probation is not dispositive of the issue of whether McLallen made or substantially influenced the ultimate decision to place Plaintiff on probation; McLallen, as the general manager and vice-president of FTData with the authority to discipline employees, Paper 60, Ex. D at 48, presumably had the authority to decide whether to accept Gonzales's suggestion to place Plaintiff on probation. Based on the evidence of the letter from McLallen to Plaintiff dated July 11, 2000, McLallen ultimately decided to place Plaintiff on probation. The evidence therefore permits the inference that Plaintiff's rejection of McLallen's advances had a causal connection to her placement on probation.

Furthermore, because according to Plaintiff's deposition, Plaintiff's transfer to PG & E had the effect of formally limiting her contracted time of employment and her commission earning opportunities (regardless of whether Plaintiff would have practically been subject to earlier termination as a part of FTData's January 2001 RIF or whether Plaintiff had actually earned commissions before her transfer), Plaintiff's transfer may also be considered an adverse action that negatively affected the terms of Plaintiff's employment. Plaintiff has therefore established a *prima facie* case of *quid pro quo* sexual harassment and Defendant's motion for summary judgment will be denied.

### b. Retaliation

■ In order to establish a *prima facie* case for retaliation, Plaintiff must show the following elements: (1) she engaged in protected activity; (2) her employer took an adverse employment action against her; and (3) there was a causal connection between the protected activity and the adverse employment action. *See Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 443 (4th Cir.1998). Defendant argues that Plaintiff cannot establish the first and third elements of the *prima facie* case for retaliation.

According to Title VII,

[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-(3)(a). Protected activity of an employee can therefore take the form of either opposing a practice prohibited under Title VII (pursuant to the opposition clause) or making a charge, testifying, assisting, or participating in an investigation, proceeding, or hearing under Title VII (pursuant to the participation clause). *Here*, Plaintiff claims that she verbally protested the "discriminatory practices" of McLallen and FTData to McLallen and that she also complained in writing in her e-mail of June 28, 2000 to McLallen. Paper 60 at 11; Ex. 1 at ¶¶ 19, 21, and 24. According to Plaintiff's affidavit, Paper 60, Ex. 1, the content of both the e-mail and verbal communications to McLallen was to "request[ ] that he cease his sexual advances." Paper 60, Ex. 1 at ¶¶ 19 and 21. Both communications were made solely to McLallen. Plaintiff claims that these actions were the protected activity in retaliation for which she suffered an adverse employment action.

Because at the time Plaintiff made her protestations against McLallen's sexual advances she had not yet formally initiated a complaint or investigation against McLallen, Pl. Dep. Tr. at 73 and 81, Paper 49, Ex. A, her activity could only be considered protected under the opposition clause and not under the participation clause of § 2000e-(3)(a). The question

therefore, is whether the specific actions that Plaintiff took—the e-mail and verbal communication to McLallen requesting him to cease his sexual advances—are protected as opposition to an unlawful practice.[5]

"To fall under the protection of the opposition clause ..., behavior need not rise to the level of formal charges of discrimination. The opposition clause has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures." *Armstrong v. Index Journal Company,* 647 F.2d 441, 448 (4th Cir.1981) (internal citations omitted). The Equal Employment Opportunity Commission (EEOC) has also identified a number of examples of conduct protected by the opposition clause including complaining (to management, unions, other employees, or newspapers) about allegedly unlawful practices and refusing to obey an order because the employee believes it is unlawful under Title VII. *See EEOC Compliance Manual,* (CCH) ¶ 8006; *see also Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 579 (6th Cir. 2000) (citing the EEOC Compliance Manual). Central to all of these illustrative examples of behavior protected by the opposition clause is the element of speaking out against a practice, *see, e.g., Chappell v. Southern Maryland Hosp., Inc.,* 320 Md. 483, 494, 578 A.2d 766, 772 (1990) ("The opposition and participation clauses ... have been liberally applied by the courts to shield employees who speak out against an employer's unlawful employment practices ..."); *see also Armstrong,* 647 F.2d at 448

("The opposition clause has been held to encompass informal protests, such as voicing complaints to employers ..."), because the plaintiff believes it is illegal. The purpose of this speaking out or reporting requirement is a logical one: in order to protect an employee from an employer's retaliation for opposing a practice, the employer must first have been placed on notice of a problematic practice. *See Berg v. La Crosse Cooler Co.,* 612 F.2d 1041, 1045 (7th Cir.1980) ("By protecting employees from retaliation, [§ 2000e–3(a)] is designed to encourage employees to call to their employers' attention discriminatory practices of which the employer may be unaware ...."); *see also Snoke v. Staff Leasing, Inc.,* 43 F.Supp.2d 1317, 1328 (M.D.Fla.1998) (finding the plaintiff's activity was not protected because "[the plaintiff's] complaints would not place an employer on notice that an employee was complaining about an unlawful employment practice under Title VII.").

Plaintiff's actions here fall short of the standard for protected activity under the opposition clause. To the extent that Plaintiff communicated only that McLallen should cease his sexual advances, Plaintiff failed to communicate that she was requesting this because she believed his advances to be illegal.[6] Second, both of Plaintiff's communications were made to McLallen only. To the extent that her actions needed to speak out against McLallen's behavior or report the behavior to either an authority or an outsider in order to be protected by the opposition

---

**5.** Most of the cases arising under the opposition clause address the question of whether the practice that is opposed was in fact made unlawful by Title VII. *See, e.g., Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170 (2nd Cir. 1996); *see also Hamner v. St. Vincent Hosp. and Health Care Center, Inc.,* 224 F.3d 701 (7th Cir.2000). Here, there is no question

that McLallen's alleged advances are prohibited under Title VII.

**6.** In fact, in her e-mail to McLallen of June 28, 2000, Plaintiff cites her need to be faithful to her husband and to her "religious and moral beliefs," Paper 60, Ex. 1, Tab 2, as her reason for requesting the cessation of McLallen's advances.

clause, both the e-mail and verbal communication fail in this regard.

Plaintiff's e-mail and verbal requests to McLallen do not meet the requirements to be considered protected activity under the opposition clause. Plaintiff has therefore failed to establish a *prima facie* case of retaliation and Defendant's motion for summary judgment on Plaintiff's retaliation claim will be granted.

### c. Hostile Work Environment and Plaintiff's Motion to Strike Defendant's Affirmative Defense

 In order to establish a *prima facie* case of hostile work environment sexual harassment, Plaintiff must show: (1) that she was subjected to unwelcome conduct; (2) the unwelcome conduct was based on sex; (3) it was sufficiently pervasive or severe to alter the conditions of employment and to create a hostile work environment; and (4) some basis exists for imputing liability to the employer. *See Smith v. First Union Nat'l Bank*, 202 F.3d 234 (4th Cir.2000). It is undisputed that Plaintiff was subjected to unwelcome conduct that was based on her sex. Defendant argues, however, that Plaintiff cannot show that the behavior to which she was allegedly subjected was severe or pervasive. Defendant also invokes the affirmative defense that, because Plaintiff unreasonably failed to take advantage of FTData's reporting procedure, FTData cannot be held liable for hostile work environment sexual harassment (*Faragher–Ellerth* defense). *See Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *see also, Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Plaintiff, of course, maintains that she was subjected to conduct so severe and pervasive that it created a hostile work environment. Plaintiff has also moved to strike Defendant's affirmative defense on the grounds that: (1) Plaintiff suffered a

tangible employment action and the *Faragher–Ellerth* defense is therefore not available to Defendant and (2) in order to assert the affirmative defense, it is FTData's burden to show that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," *Ellerth*, 524 U.S. at 765, 118 S.Ct. at 2270, and FTData has failed to do so. Although delineated a "motion to strike," Plaintiffs's motion is really a summary judgment motion and will be addressed as such.

In *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993), the Supreme Court explained that in order to be actionable under Title VII, a sexually objectionable environment must be both objectively and subjectively offensive—i.e., one that a reasonable person would find hostile or abusive and one that the plaintiff found to be so. The Court then instructed that the determination of the sufficiency of an environment's hostility or abusiveness should be made by considering all the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*, at 23, 114 S.Ct. at 371. Simple teasing, offhand comments, and isolated incidents (unless extremely serious), however, do not qualify as having an effect on the "terms and conditions of employment." *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 82, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998).

Plaintiff has offered deposition testimony and affidavit statements that, over a six month period, McLallen: told her that he could not look at anyone but her at his daughter's funeral, Pl. Depo. Tr. at 35, Paper 49, Ex. A; tried to kiss her on

several occasions, *id.;* told her if she would receive his advances, she could take two hour lunches, do whatever she wanted to do, and come and go as she pleased, *id.;* asked her to stay late or meet before work, *id.* at 36; told her he was attracted to her, *id.;* put his hand on her leg, *id.;* would call her to his office, shut the door, and ask why she did not like him or want to reciprocate his attraction, *id.* at 56; tried on three occasions to touch her inappropriately, *id.;* told her if she were his wife, he would take care of her, *id.* at 56–57; and chased her around a television cart and attempted to kiss her in the basement of PG & E, *id.* at 88. Furthermore, Plaintiff claims in her affidavit that McLallen forced himself upon her physically, kissed her, touched her breasts, thigh, and buttocks and ignored her protestations, Paper 60, Ex. 1 at ¶¶ 14, 16–17. The court finds that Plaintiff has presented evidence that the discriminatory conduct she suffered was frequent, severe, and objectively offensive. Plaintiff has also presented evidence that she found McLallen's conduct subjectively offensive as well. Plaintiff states that McLallen's conduct resulted in Plaintiff being afraid of him and seeking the treatment of a therapist who diagnosed Plaintiff as suffering from Post–Traumatic Stress Disorder, *id.* at ¶¶ 16, 20, and 38, and that Plaintiff felt unsafe at FTData and when approaching her supervisor (McLallen) about her employment or performance, *id.* at ¶¶ 16 and 20. The details of McLallen's conduct that Plaintiff proffers through her evidence is certainly more than "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing," *Faragher,* 524 U.S. at 788, 118 S.Ct. at 2284 (internal citations omitted), that should stay outside of Title VII's scope. Plaintiff has therefore established the third element of the *prima facie* case for hostile work environment.

Defendant argues that even if Plaintiff manages to establish the element of a hostile work environment, FTData cannot be held liable pursuant to the holdings in *Faragher,* 524 U.S. at 807–08, 118 S.Ct. at 2292–93, and *Ellerth,* 524 U.S. at 765, 118 S.Ct. at 2270, that establish that an employer is not vicariously liable for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee when:

(a) [ ] the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and

(b) [ ] the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Ellerth,* 524 U.S. at 765, 118 S.Ct. at 2270. FTData argues that it exercised reasonable care by having a comprehensive anti-harassment policy in place prohibiting sexual harassment and identifying several different individuals to whom complaints could be addressed. FTData also argues that Plaintiff unreasonably failed to take advantage of the avenues of redress that FTData offered because she never complained about McLallen's conduct until FTData began an independent sexual harassment investigation of McLallen despite Plaintiff's awareness that she could complain to any FTData manager about sexual harassment. Pl. Depo. Tr. at 26, Paper 49, Ex. A.

Plaintiff challenges the defense, as noted above, on two grounds. First, the *Faragher–Ellerth* defense is explicitly not available to an employer when "the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Faragher,* 524 U.S. at 808, 118 S.Ct. at 2293 (citing *Ellerth,* 524 U.S. at 762–63, 118 S.Ct. at 2269). This court has already

found that Plaintiff satisfied a showing of the element of a tangible employment action in establishing her *prima facie* case for *quid pro quo* harassment, which, if found by the trier of fact, will overcome this defense. At this stage, however, there have been no findings of fact on this question. The *Faragher–Ellerth* affirmative defense may be relevant if a fact-finder has to determine whether, aside from the alleged tangible employment action, there was a hostile work environment. A dispute of material fact has already been found to exist concerning whether Plaintiff suffered a tangible employment action, and Plaintiff's motion to strike on this basis will therefore be denied just as Defendant's motion for summary judgment on the hostile work environment claim will be denied.

■ With respect to Plaintiff's second argument regarding FTData's failure to demonstrate the adequacy of its anti-harassment policy, the Fourth Circuit has held that "[d]istribution of an anti-harassment policy provides 'compelling proof' that the company exercised reasonable care in preventing and promptly correcting sexual harassment." *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 266 (4th Cir.2001) (citing *Lissau v. Southern Food Serv.*, 159 F.3d 177, 182 (4th Cir. 1998) and *Brown v. Perry*, 184 F.3d 388, 396 (4th Cir.1999)). FTData has proffered evidence to show that it has an anti-harassment policy with a reporting procedure, Pl. Depo. Tr. at 25, Paper 49, Ex. A;

Pl. Depo. Ex. 5, Paper 49, Ex. B5; the policy is published on a poster prominently displayed in FTData's offices and in the Employee Handbook which is given to each employee on the first day of work, *id.*; Gonzales Depo. Tr. at 91–92, Paper 49, Ex. D; Gonzales Affidavit at ¶ 14, Paper 49, Ex. C; Gonzales Affidavit Ex. 3, Paper 49, Ex. C3; and each employee is then required to sign a form acknowledging that he or she has read and understands the handbook, Pl. Depo. Ex. 4, Paper 49, Ex. B4. The court therefore finds that Defendant has made an adequate showing in support of its claim that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior and Plaintiff's motion to strike will be denied on this basis as well.

### 3. Assault (Amended Count III)

■ The assault claim that Plaintiff brings in her amended complaint charges McLallen with assault and FTData with liability for the assault on the theory that McLallen was FTData's alter ego. Defendant argues that Plaintiff cannot establish the elements of an assault claim and that FTData is not liable for McLallen's conduct because McLallen is not FTData's alter ego. The court will begin by addressing the issue of FTData's liability.

Under Maryland law, an "employee must be the 'alter ego' of the employer in order [for the plaintiff] to hold the employer liable for the intentional acts of the employee."[7] *Continental Casualty Co. v.*

---

**7.** Plaintiff cites to *Federated Dep't Stores, Inc. v. Le*, 324 Md. 71, 595 A.2d 1067 (1991) for the proposition that this holding in *Mirabile* is too narrow. The Maryland Court of Appeals found in *Le* that "[a]bsent the bar of Art. 101, in order for an employer to be held liable for the intentional torts of an employee committed *within the scope of employment*, the employee need not be the 'alter ego' of the employer." *Id.*, 324 Md. at 85–86, 595 A.2d at 1074 (emphasis added). This court has already found that Plaintiff failed to allege facts

sufficient to support a finding that McLallen's assault was committed within the scope of his employment. *See Rachel-Smith v. FTData, Inc.*, 202 F.Supp.2d 400, 405 (D.Md.2002). It was for this reason that Plaintiff amended her assault claim and re-pled it on the "alter ego" theory. With respect to claims for intentional torts that are not committed within the scope of employment, without the explicit overruling by the Court of Appeals of Maryland, this court presumes that the *Mirabile* holding that

*Mirabile,* 52 Md.App. 387, 397, 449 A.2d 1176, 1183 (1982) (citing *Schatz v. York Steak House Systems, Inc.,* 51 Md.App. 494, 496–97, 444 A.2d 1045, 1047 (1982)). Beyond this, however, Maryland courts have not fleshed out the definition of "alter ego" in the context of employee relations. *See* Stanley Mazaroff, *Maryland Employment Law* § 2.08 (2d ed.2001). In fact, the "alter ego" concept is most well-developed in the context of the equitable doctrine of piercing the corporate veil, i.e. holding shareholders personally liable for harmful acts committed through the corporation to prevent fraud or injustice. *See, e.g., William Danzer & Co. v. Western Maryland Railway Co.,* 164 Md. 448, 165 A. 463 (1933); *see also Travel Committee, Inc. v. Pan American World Airways, Inc.,* 91 Md.App. 123, 157–60, 603 A.2d 1301, 1317–18 (1992); *see generally Kinney Shoe Corp. v. Polan,* 939 F.2d 209 (4th Cir. 1991). *Schatz* brought the alter ego doctrine into the purview of workmen's compensation law in Maryland, noting that "[t]he majority of jurisdictions that have considered the question have held that absent express authorization by the employer, the agent must be the 'alter ego' of the employer in order for his intentional misconduct to be attributed to the employer." *Schatz,* 51 Md.App. at 496–97, 444 A.2d at 1047 (citing *Jablonski v. Multack and Max Lee Corp.,* 63 Ill.App.3d 908, 20 Ill.Dec. 715, 380 N.E.2d 924 (1978); *McGrew v. Consolidated Freightways, Inc.,* 141 Mont. 324, 377 P.2d 350 (1963); *Bryan v. Utah Int'l,* Utah, 533 P.2d 892 (1975)).

In *Mirabile,* the Court of Special Appeals observed that "[a]ttribution of employer liability for the actor's conduct should be based on identification rather than agency and is appropriate only where the actual tortfeasor is of such a rank or

position that he may be deemed the alter ego of the employer." *Id.,* 52 Md.App. at 396–97, 449 A.2d at 1182. The *Mirabile* court then went on to note that simply being in a supervisory role does not alone confer alter ego status on an alleged tortfeasor and ruled that no evidence had been presented to show that the defendant in that case "was of such a status in [the corporation's] organization as to be characterized as [its] alter ego." *Id.,* at 397, 449 A.2d at 1183.

Plaintiff proffers the following evidence to show that McLallen was FTData's alter ego: McLallen was hired to relieve Frank Tyner (Tyner), FTData's president, from the day-to-day management of the company's operations. McLallen was then promoted to the position of "General Manager" and "Vice President." After this promotion, Tyner no longer involved himself in the company's day-to-day operations and thereafter took on the role of "Chairman of the Board." As General Manager, McLallen had complete authority over all of FTData's personnel decisions—such as hiring, firing, promoting, and transferring—including those involving Plaintiff.

In *Mirabile,* the court found that the plaintiff's direct supervisor, who had allegedly assaulted and battered plaintiff, did not qualify as the employer's alter ego. *Mirabile,* 52 Md.App. at 397–98, 449 A.2d at 1183. The court in *Schatz* affirmed the trial court's finding that the assistant manager at the restaurant where the plaintiff worked as a waitress who allegedly raped the plaintiff at work, did not qualify as the restaurant's alter ego. The court noted that even though the assistant manager had considerable responsibility for the day-to-day operations of the restaurant

the employer may only be held liable if the alleged tortfeasor was the "alter ego" of the

employer to be valid still.

and even had the authority to fire waitresses, he did not have the authority to enter into contracts and agreements on behalf of the restaurant, nor was he a director, officer, or shareholder of the corporation. *Schatz,* 51 Md.App. at 495, 444 A.2d at 1046. Likewise, even though McLallen was given a large amount of responsibility at FTData, his authority did not rise to the level where his conduct could be attributed to FTData based on "identification." *See Mirabile,* 52 Md.App. at 397–97, 449 A.2d at 1182. That is, while McLallen served as General Manager and Vice President of FTData with authority over day-to-day operations and personnel decisions, these titles and responsibilities did not confer on McLallen a virtual identification with the corporate entity of FTData. Finding that McLallen was not FTData's alter ego, the court does not need to reach the question of whether Plaintiff can support the elements of her assault claim, and Defendant's motion for summary judgment on Plaintiff's re-pled assault claim is granted.

### 4. Claim of Wrongful Discharge/Prostitution (Count IV)

Plaintiff alleges in her Complaint that she was discharged for refusing to engage in conduct that would constitute prostitution. In *Insignia Residential Corp. v. Ashton,* 359 Md. 560, 755 A.2d 1080 (2000), the Maryland Court of Appeals found that a tort action for wrongful discharge is not precluded by state or federal sexual harassment law where the discharge violates an entirely separate, independently based, public policy like the one embodied in Maryland Code Article 27, § 15 prohibiting a person from engaging in prostitution. *Id.,* 359 Md. at 573, 755 A.2d at 1087. Plaintiff claims that McLallen's entreaties to Plaintiff constituted a solicitation for her to engage in prostitution. Even though Plaintiff's refusal of McLallen's advances did not result directly

in her discharge, Plaintiff argues that applying the *Insignia* wrongful discharge holding to an instance of wrongful demotion or reassignment would be a natural extension of the reasoning of the Maryland Court of Appeals. Plaintiff further argues that her reassignment to PG & E portended her termination and that *Insignia* should control here because of that fact.

Plaintiff's argument is unpersuasive. *Insignia* addresses only the tort of wrongful or abusive discharge and the analysis of the Court of Appeals in that case carefully and vigorously distinguishes and develops a line of cases involving plaintiffs who are wrongfully discharged. Plaintiff facilely asserts that "since no principled distinction can be made under the civil rights laws between a retaliatory discharge and a retaliatory demotion or reassignment, none should exist here." Paper 60, at 19. The question of whether Plaintiff may avail herself of *Insignia's* holding is a question of state law. Under Maryland law, the tort of wrongful discharge is recognized, *see Adler v. American Standard Corp.,* 291 Md. 31, 432 A.2d 464 (1981), while there is no evidence that the tort of wrongful demotion or wrongful reassignment is recognized. It is not the role of this court to recognize such a tort.

The facts in evidence show that the chain of events between McLallen's entreaties and Plaintiff's ultimate discharge are too attenuated to support a claim of wrongful discharge under Maryland law. A cause of action may exist for an at-will employee when motivation for the discharge contravenes some clear mandate of public policy. *See Insignia,* 359 Md. at 561, 755 A.2d at 1081 (citing *Adler,* 291 Md. at 35, 432 A.2d at 467). The public policy Plaintiff relies on here is the policy against prostitution. As Defendant points out, it is undisputed that McLallen was discharged in September 2000 and that

Plaintiff was not discharged until April 2001. Because it was McLallen whom Plaintiff claims entreated her for sexual favors, the motivation for Plaintiff's discharge could not have been Plaintiff's rejection of McLallen's entreaties. Defendant's motion for summary judgment on Plaintiff's wrongful discharge/prostitution claim is therefore granted.

## IV. Conclusion

For the foregoing reasons the court will: (1) grant in part and deny in part Defendant's motion to strike and for sanctions and costs; (2) deny Plaintiff's motion to strike Defendant's motion for summary judgment on the amended complaint; (3) grant Defendant's motion for leave to file summary judgment motion on the amended complaint; (4) grant Defendant's motion for summary judgment on count I (claims under the PGCC), the retaliation claim under count II (Title VII claims), count III (assault), and count IV (wrongful discharge/prostitution); (5) deny Defendant's motion for summary judgment on Plaintiff's *quid pro quo* and hostile work environment sexual harassment claims under count II; and (6) deny Plaintiff's motion to strike Defendant's affirmative defense. A separate order will follow.

### ORDER

For the reasons stated in the foregoing Memorandum Opinion, it is this ___ day of February, 2003, by the United States District Court for the District of Maryland, ORDERED that:

1. Defendant's Motion to Strike and for Sanctions and Costs pursuant to Fed. R.Civ.P. 37(b) BE, and the same hereby IS, GRANTED in part and DENIED in part;

2. Within the next 30 days, Plaintiff pay the $500 cancellation fee to Dr. Brian Schulman for her failure to appear for the Independent Medical Examination scheduled for May 31, 2002;

3. Plaintiff's Motion to Strike Defendant's Motion for Summary Judgment on Plaintiff's Amended Complaint BE, and the same hereby IS, DENIED;

4. Defendant's Motion for Leave to File Motion for Summary Judgment on Plaintiff's Amended Complaint BE, and the same hereby IS, GRANTED;

5. Defendant's Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56 BE, and the same hereby IS, GRANTED in part and DENIED in part;

6. Judgment BE, and the same hereby IS, ENTERED in favor of Defendant FTData and against Plaintiff Victoria Rachel–Smith as to count I (claims under the PGCC), the retaliation claim under count II (Title VII claims), count III (assault), and count IV (wrongful discharge/prostitution);

7. Plaintiff's Motion to Strike Defendant's Affirmative Defense BE, and the same hereby IS, DENIED;

8. A telephone scheduling conference, initiated by Chambers, will be held at 9:00 a.m. on March 5, 2003; and

9. The Clerk transmit copies of the Memorandum Opinion and this Order to counsel for the parties.