**Hallie L. WANG, Plaintiff,**

v.

**METROPOLITAN LIFE INSURANCE CO., et al., Defendants.**

**No. CIV.RDB 03–68.**

United States District Court,
D. Maryland,
Southern Division.

Sept. 14, 2004.

Richard L. Swick, Swick and Shapiro PC, Washington, DC, for Plaintiff.

Joseph C. O'Keefe, Proskauer Rose LLP, Mark A. Saloman, Proskauer Rose LLP, Newark, NJ, Stephanie L. Marn, Susan Brinkerhoff, Proskauer Rose LLP, Washington, DC, for Defendants.

## MEMORANDUM OPINION

BENNETT, District Judge.

Plaintiff Hallie L. Wang is a Chinese–American woman who alleges that her former employer, Metropolitan Life Insurance Company ("MetLife"),[1] discriminated against her on the basis of gender and race in derogation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e, et seq. ("Title VII"), and 42 U.S.C. § 1981 ("Section 1981"). Wang's Complaint sets forth the following three Counts: Count I for race discrimination under Title VII and § 1981, Count II for gender discrimination under Title VII, and Count III for retaliation.

Ms. Wang worked at MetLife as a Financial Services Representative ("FSR") selling insurance and related products from September of 1997 until her termination in May of 2002. The gravamen of Plaintiff's charge is three-fold. First, she alleges that one of her co-workers engaged in a series of racially discriminatory acts which made it difficult for Plaintiff to perform her job. Second, Ms. Wang claims that she was subjected to gender discrimination and sexual harassment by MetLife Regional Vice President David Mancini. Third, Plaintiff claims that her complaints about this race and gender discrimination resulted in her retaliatory termination.

Defendant MetLife has moved for summary judgment contending that Plaintiff cannot sustain any of her claims based on the undisputed record. For the foregoing reasons, the Court GRANTS the Defendant's Motion for Summary Judgment on Count I (race discrimination) and Count III (retaliation), and DENIES Defendant's Motion with respect to Count II (gender discrimination).

## I. Background

At the beginning of her employment with MetLife, Plaintiff received three months of training (Wang Dep. 63:12–25.) During the training, Plaintiff received (*Id.* at 64:18–25) and reviewed (*Id.* at 77:12–23) MetLife's "Policy Against Sexual Harassment." Plaintiff also understood, as a result of that training, that all MetLife employees were to be "courteous" "fair" "responsive" and "professional" when dealing with MetLife customers. (*Id.* at 68:12–20.)

1. Plaintiff has also sued the related entities of MetLife Financial Services, and MetLife Group, Inc. These entities are one in the same and will therefore be treated as the same Defendant.

In June of 1999, Wang was transferred from the MetLife Centurion Office in Rockville, Maryland to the MetLife American Office, also in Rockville, Maryland. At the time of Plaintiff's transfer, the American Office was managed by Roy Brown. All of the alleged acts of race and gender discrimination occurred while Ms. Wang was employed at the American Office.

## A. *Racial Harassment by Cindy Gagnon*

The main perpetrator of the race discrimination alleged by Plaintiff was Cindy Gagnon. Ms. Gagnon is a white female who was the office administrator at the American Office throughout Plaintiff's tenure there. As the office administrator, Ms. Gagnon was responsible for assisting the Financial Service Representatives, such as Plaintiff Wang, with obtaining licenses and providing them with important information necessary to maintain their accounts and to obtain new business. Rather than assisting Plaintiff in this way, Ms. Gagnon "treated her as if she did not belong in the office." (Pl.'s Mem. Opp. at 5.)

Plaintiff's trouble with Ms. Gagnon began when Ms. Gagnon failed to properly process Plaintiff's license to sell insurance in Maryland. Plaintiff passed the required "series 6" exam on October 14, 1999. She promptly submitted the paperwork necessary to obtain the Maryland license to Ms. Gagnon. She contends that Ms. Gagnon intentionally held up the registration of her Maryland license application to sell insurance for several months. (Brown Dep. at 100:8–10).

There is no dispute that the processing of Plaintiff's license to sell insurance in Maryland was delayed. The license was not ultimately obtained until February of 2000. However, Cynthia Gagnon testified that an initial delay resulted from the fact that Mr. Brown ordered her to forward Plaintiff's application to the internal processing center without the required documentation. (Gagnon Dep. at 13–21.) Defendant also submitted unrebutted evidence that other delays were due to administrative errors of the part of the licensing processing authorities in the District of Columbia government. (*See* Def.'s Mem. Supp. Mot. Summ. J. at 7–8.)

In addition to delaying her the license processing, Plaintiff alleges Ms. Gagnon incorrectly told her that she was not licensed to sell insurance in Washington, D.C. This error caused the Plaintiff to lose a $3 million sale. (Wang Dep. at 306:21–307:7.) Gagnon also "mistakenly" told Plaintiff that she was not eligible for a license in Virginia. (Wang Dep. at 199:7–12.) Plaintiff did not allege that these statements were intentionally made.[2]

Ms. Wang made a written complaint about Ms. Gagnon to her supervisor on November 2, 1999. (Pl.'s Mem. Opp. Ex. 7.) That complaint pertained only to Ms. Gagnon's "mishandling" of licensing delays and her "lack of professionalism" with regard to the licensing delays. (*See id.*) There was no mention of discrimination based on race or gender. (*See id.*) After the complaint, Ms. Gagnon's treatment of Plaintiff grew worse. In April of 2000, Ms. Gagnon refused to put Plaintiff on the lobby duty list from which information about new customers who call or walk into the office is dispersed. (Wang Dep. at 213:15–18.) She refused to even give the list to Plaintiff. (*Id.*) After the Plaintiff

---

**2.** During this same period, Gagnon also interfered with Plaintiff's ability to be reimbursed for the expense of taking the licensing exam. Gagnon accused Ms. Wang of seeking reimbursement from the American Office after already having been reimbursed by the Centurion Office when Ms. Wang had not, in fact, been reimbursed. (Wang Dep. at 228:13–20.)

complained to Mr. Brown, Gagnon was directed to put Plaintiff on the list. However, even though Gagnon complied and placed her name on the list, Ms. Gagnon failed to direct the calls to Wang, instead giving them to other FSR's. (*Id.* at 217:21–25.) It is undisputed that another Asian–American woman, Nancy Shaw, was among those FSR's who were allegedly treated more favorably than Wang.

Gagnon's "worsened" behavior extended beyond the lobby call list. In June of 2000, Ms. Gagnon delayed in processing Plaintiff's application to renew her sales license for two and three weeks. (*Id.* at 361.) On March 7, 2001, Ms. Gagnon demanded proof that Plaintiff had actually attended a meeting for which Plaintiff was seeking reimbursement. (*Id.* at 336.) Moreover, Gagnon demanded that Plaintiff submit the reimbursement paperwork to the new managing director, George Kinigopolous, who had replaced Mr. Brown as the Managing Director for the American Office. (*Id.*)

As a result of this alleged harassment, Plaintiff e-mailed a formal written complaint to American Office Managing Director George Kinigopolous and Human Resources Generalist Christopher Johnson on March 14, 2001. In that complaint, Ms. Wang alleged that Ms. Gagnon was discriminating against her based on her race. In response, MetLife conducted a formal on-site "Work Environment Study" in which MetLife Human Resources Generalist Christopher Johnson interviewed most of the employees at the American Office in a confidential setting. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 21.) Based on this investigation, Mr. Johnson concluded that

Plaintiff's complaints were due to a "poor working relationship" between Wang and Gagnon. He set forth various recommendations designed to address that problem. (*Id.* at 3–4.) Mr. Johnson found no evidence of racial discrimination. (*Id.*)[3] Plaintiff was advised of the findings of this report in a meeting on May 16, 2001. Both Ms. Wang and Ms. Gagnon were also advised of the company policy against retaliating against an individual based on such a complaint. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 22 and Ex. 23.)

After the investigation, Plaintiff alleges that Ms. Gagnon continued to deprive her of business. Gagnon did this by first failing to direct customer calls to Plaintiff, even though Plaintiff's name was on the lobby duty list. (Wang Dep. at 445:3–10.) In addition, Gagnon did not transfer valuable customer accounts to Plaintiff, as she was required to do under MetLife's company procedures. The accounts in question belonged to the Wu family. The accounts became eligible for transfer after the FSR handling the accounts left MetLife. Despite the fact that Plaintiff's prior service on some of the Wu family accounts entitled her to receive them, Gagnon transferred the accounts to another Asian FSR, Nancy Shaw. Ms. Gagnon contends that the failure to transfer the accounts was an oversight. (Gagnon Dep. at 103:1–5; 104:6–12.) On March 23, 2002, when Ms. Wang learned of the improper transfer, she immediately complained to Mr. Kinigopolous. In response to this complaint, MetLife management directed that the accounts be transferred to Plaintiff as soon as possible. (Def.'s Mem. Supp. Mot.

---

3. Plaintiff generally argues that the investigation was biased because the ultimate decision-maker was David Mancini, against whom she now alleges sexual harassment. However, Plaintiff offers no evidence to contradict Defendant's evidence that Mancini played no role in the investigation conducted by Chris Johnson. (*See* D. Mancini Dep. at 139:5–11.) Moreover, Plaintiff does not attack any of the factual findings, summaries of testimony or other supporting material contained within the extensive report prepared by Mr. Johnson. (*See* Def.'s Mem. Supp. Mot. Summ. J. Ex. 21.)

Summ. J. Ex. 24.) The paperwork authorizing that transfer was faxed to the appropriate office on March 29, 2002. (Gagnon Dep. 108:6–10; Def.'s Mem. Supp. Mot. Summ. J. Ex. 25.) Due to normal processing delays, Plaintiff was never credited for at least some of the Wu accounts before she left MetLife in May of 2002.

On April 2, 2002, Plaintiff complained to the American Office's Assistant Director that she believed that Ms. Gagnon had intentionally delayed the processing of yet another license, the General American insurance license. (Wang Dep. 598:7–12.) Management investigated that allegation and concluded that Ms. Gagnon had not intentionally delayed the license processing. On April 8, 2002, Managing Director Kinigopolous, his Assistant Director and Plaintiff met regarding the licensing delay. During that meeting, Plaintiff was informed of the finding that Gagnon did not intentionally delay the processing of her license. Plaintiff was also told to stop complaining about Ms. Gagnon.[4] (Wang Dep. at 616, 619.) Despite this, Plaintiff told Mr. Kinigopolous that, if he would not investigate Ms. Gagnon further, she would complain to Human Resources management about the purported "cover-up" of Ms. Gagnon's conduct by David Mancini, and his regional assistant, Kathy Britton.[5] (Wang Dep. 616:24 to 617:1–5; Kinigopolous Dep. at 102:20–21; 103:19–21.)

## B. *Sexual Harassment by David Mancini*

Independent of her problems with Ms. Gagnon, Ms. Wang also claims that she was sexually harassed by MetLife Regional Vice President David Mancini. This harassment began shortly after she passed her licensing exam. Mr. Mancini sent her a congratulatory note which she contends included the number "69." (Wang Dep. at 250.) Ms. Gagnon, who routinely opened the mail for the office, intercepted the card and humiliated Wang by commenting on the card in front of her co-workers and implying that Plaintiff had an intimate relationship with Mr. Mancini. (*Id.* at 251–52.) When Wang later encountered Mr. Mancini at a sales meeting, he asked her whether she liked the card. (*Id.* at 258:9–10.) During that encounter, Mr. Mancini told Plaintiff that he would be "happy to show" her what the "69" meant. (*Id.* at 259:2–6.)

At a June 8, 2000 regional summer kick-off meeting, Mancini "threatened" Plaintiff by reminding her that he was "the third [most] powerful person in the company" and that he could help Plaintiff "in many ways." (*Id.* at 244.) He also told her that he did not know if he could ever help her anymore, suggesting that he no longer favored her because of her refusal to have sex with him. (*See id.*) This caused Plaintiff to fear for her job. (*Id.*)

In an effort to curry favor with Mr. Mancini (and thereby protect her job), Plaintiff went to his office to give him a gift from her trip to China, in July of 2000. During that visit, Mancini grabbed Ms. Wang's arm and put his hand on her waist. (*Id.* at 273:15–16.) Though Ms. Wang wanted to give him the gift and leave, he told her to come back on July 14, 2000. Ms. Wang returned to his office on July 14, 2000, to give him the gift. When she went to leave, he "came very close to her" and asked her to dinner or a movie (Wang

---

4. She was also told to stop complaining about David Mancini.

5. Kathy Susan Britton is the Regional Assistant to Mr. Mancini. During Plaintiff's tenure, Ms. Britton and Mr. Mancini were dating. The two eventually were married, and Ms. Britton became Kathy Susan Mancini.

Dep. at 281:5–6) and he touched her "crotch" (*Id.* at 281:15–16). Ms. Wang rebuffed Mancini's advance and promptly left his office. (Wang Dep. at 281:16–20.)

In February of 2001, as Wang continued to remain under Mancini's supervision, the two were required to attend an out-of-town sales meeting. At this meeting, Mancini invited Plaintiff to come to his hotel room. Specifically he suggested that she, "come to my place and stay with me." (*Id.* at 531:24–25.) Plaintiff refused and never went to his hotel room. (*Id.* at 532:3–7.) When the group from MetLife was preparing to leave the hotel, Mancini came to Wang's room and began kissing her and putting his hands under her sweater and trying to fondle her. (*Id.* at 538:25–539:9.) Ms. Wang forcefully pushed Mancini away and expressed her desire that they immediately leave the hotel. (*Id.* at 539:4–6.) Though Plaintiff made no official complaint about the incident, she informally reported the incident to Handon Pasquier, the manager of the MetLife office in Northern Virginia. (*See id.* at 540.) Mr. Pasquier took no action because he was under Mancini's supervision.

In July of 2001, at a conference in San Diego, Mr. Mancini told Plaintiff that she owed him sexual favors for all the things he did for her at MetLife over the years. Wang threatened to sue Mancini for sexual harassment, to which he responded, "go ahead." (Wang Dep. at 580:15–16.)

Plaintiff tried to report the sexual harassment at the April 8, 2002 meeting regarding Ms. Gagnon but was told not to complain about either Mancini or Gagnon. (*See* Wang Dep. at 619:9–11.) While Plaintiff had no direct contact with Mr. Mancini after July 28, 2001 (Wang Dep. 524:1–3; 580:22–581:5; 586:8–11), he remained involved in the review of Wang's complaints against Gagnon, and in personnel decisions relating to her employment status.

## C. *Plaintiff's Termination*

Plaintiff was terminated from MetLife in a letter signed by David Mancini on May 3, 2002. MetLife evaluated several factors in making the decision to terminate her. The first factor considered by MetLife was the complaints of three of Plaintiff's Asian co-workers. These co-workers claimed that Plaintiff spoke ill of them to their own customers and that she attempted to contact their customers behind their backs. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 27; Yang Dep. at 50:5–16.)

The more significant event triggering Plaintiff's termination was a complaint lodged by her own customer, Ms. Jie Li. Ms. Li called Plaintiff in 2002 to discuss her interest in purchasing a new term life insurance policy from MetLife. (Li Dep. at 6:2–9.) Ms. Li previously purchased a whole life insurance policy with Wang, and had renewed it with her each year until 2002. Ms. Wang did not return Ms. Li's telephone call for several days. (*Id.* at 10:7–13.)

In the interim, Ms. Li selected another agent, Lily Yang, from the "Chinese Yellow Pages" with whom to discuss the proposed purchase. Ms. Yang is an FSR who also worked in the American Office with Plaintiff. In response to Ms. Li's inquiry, Yang sent her an application form for a term life policy. (Li Dep. at 12:2–10.) On the same day Ms. Li received the application, Wang returned Li's original telephone call. (Li Dep. at 13:19–14:10; Yang Dep. 26:1.) Ms. Li told her that she had already received the requested application for insurance from Lily Yang.

During the course of the telephone conversation, Li claims that Plaintiff told her that Ms. Yang was "not a good lady," that "[s]he always do [*sic*] something wrong, and that [s]he done some very bad case before." (Li Dep. at 14:11–16.) Li further claims that Wang told her that Yang had a

bad record for selling insurance and that people only bought insurance from her because she had a pretty face.[6] (*Id.* at 29:10–20.) Wang also instructed Ms. Li to mail the completed application form directly to her home. (Li Dep. at 27:10–14; 47:7–9.)

Ms. Li was unable to complete the form on her own and called Wang a few days later with questions. (Wang Dep. at 625:8–12.) After failing to reach her, Li called Yang. The next evening, Plaintiff returned Li's call. During that telephone conversation, Li told Wang that it would not be fair to buy the policy from her, when Yang had given her "a lot of help." (Li Dep. at 19:13–15.) Wang became upset that Ms. Li would buy from Ms. Yang after she had given her prior service.[7] Wang became angry[8] and Ms. Li claims that she called her the "Chinese equivalent" of a "bitch." (Li Dep. 19:10–20:12; 21:17–21; 22:2–4.)

Plaintiff hung up on Ms. Li (Wang Dep. at 641:10–12), and Ms. Li began to cook her dinner. Moments later, Plaintiff called Ms. Li back and told her that her policy was "illegal" because the form was delivered by mail as opposed to in-person. (Wang Dep. 628:5–10.) Li hung up the telephone and searched for Yang's number. In the confusion, a cooking pot which Ms. Li had left cooking on the stove ignited, causing smoke damage to Ms. Li's kitchen ceiling. (Li Dep. 24:17–18.) Plaintiff called Ms. Li two additional times that night.

Very upset by this incident, Ms. Li and her fiancé, William Webster, complained initially to Managing Director George Kinigopolous on April 10, 2002. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 34.) At Kinigopolous' direction, the couple filed a written complaint on April 28, 2002. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 36.) Lily Yang also submitted a written statement corroborating Ms. Li's account of the events. (*See* Def.'s Mem. Supp. Mot. Summ. J. Ex. 35.) After he obtained these statements, Kinigopolous met with Plaintiff to review the allegations. (Kinigopolous Dep. at 91:2–7.)

Plaintiff's employment was terminated on May 3, 2002. MetLife contended that her behavior violated their stated policy for customer service, and their "zero tolerance" policy regarding threats to customers or co-workers. After Plaintiff's termination, her customer accounts were transferred to Ms. Shaw, one of Plaintiff's Chinese co-workers. (Kinigopolous Dep. at 119:16–22.)

Customer complaints about the improper *behavior* (as opposed to responsiveness and soundness of recommendations) of Financial Service Representatives ("FSR's") such as those made by Ms. Li against Ms. Wang were very unusual at MetLife. (K. Mancini Dep. at 54:1–8.) Plaintiff was the only FSR in recent memory who was the subject of such complaints. (Kinigopolous Dep. 24:19–24.) Plaintiff herself could only recall one other complaint, against Shaw. That complaint involved a customer

---

**6.** Though Plaintiff denies making the specific statements alleged, she acknowledges that she told Li that Yang was wrong to send the application in the mail, because MetLife procedure required her to meet with an agent. (Wang Dep. at 627, 629.) Plaintiff also admits that she told Li that her policy might be "in trouble" because of the violation of company procedure. (*Id.* at 628.) MetLife has produced undisputed evidence that the company has no such procedures.

**7.** (Wang Dep. 627:4–12;627:18–23; 628:8–17.)

**8.** Though Plaintiff admits that she was upset with Ms. Li's "behavior" and felt that she was a "chronic liar" because Ms. Li had "played her," she denies that she cursed at her. (Wang Dep. at 628–629.)

who claimed that Shaw did not give the customer "full service." (Wang Dep. 662:13–18.) The American Agency received no complaints of rude or hostile behavior toward customers during Mr. Kinigopolous' tenure as manager. (Kinigopolous Dep. at 34:10–14.)

Plaintiff filed her Formal Complaint with the Equal Opportunity Employment Commission ("EEOC") on July 10, 2002. (Pl.'s Mem. Opp. Ex. 9.) The Formal Complaint alleges that Plaintiff Wang was subjected to: "discrimination and a hostile work environment based on her race and national origin, as well as a hostile work environment, sexual harassment, *quid pro quo* sexual harassment, discrimination based on her sex, and retaliation for complaining of this discrimination and hostile work environment." (*Id.* at MLW 1033.) The Formal Complaint also alleges that the "discrimination, hostile work environment and retaliation culminated in" Plaintiff's termination. (*Id.*) The EEOC was unable to conclude that any violations had occurred, and issued Plaintiff a Dismissal and Notice of Rights to sue MetLife on November 14, 2002. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 2.)

## II. *Standard of Review*

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no *genuine* issue as to any *material* fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c) (emphasis added). In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court explained that only "facts that might affect the outcome of the suit under the governing law" are *material. Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Moreover, a dispute over a material

fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court further explained that, in considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence supporting a claimed factual dispute exists to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249, 106 S.Ct. 2505. In that context, a court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

However, "[w]hen the moving party has met its responsibility of identifying the basis for its motion, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 101 (4th Cir.1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(e)). Thus, Rule 56 mandates summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548. If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. Similarly, the existence of a mere "scintilla" of evidence in support of the nonmoving party's case is insufficient to preclude an order granting summary judgment. *Id.* at 252, 106 S.Ct. 2505. Furthermore, District Courts have an "affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves - Humphreys Co.*, 818 F.2d 1126, 1128 (4th

Cir.1987)(citing *Celotex Corp.*, 477 U.S. at 323–24, 106 S.Ct. 2548).

A genuine issue of material fact may exist if the evidence presented to the court is sufficient to indicate the existence of a factual dispute that could be resolved in favor of the non-moving party at trial. *Rachel–Smith v. FTData, Inc.*, 247 F.Supp.2d 734, 742 (citing *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505). Moreover, any inferences drawn from disputed evidence must be accorded to the non-moving party. *See Matsushita*, 475 U.S. at 587–88, 106 S.Ct. 1348; *Pulliam Investment Co., Inc. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987).

### III. *Analysis*

#### A. *Count I–Race Discrimination Under Title VII*

■■■ Count I of Wang's Complaint alleges that Cindy Gagnon's "campaign of discrimination" against her (which was sanctioned by her superiors) constituted a racially hostile work environment, in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), and of 42 U.S.C. § 1981 ("Section 1981").[9] Plaintiff's claims must be analyzed under the framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). As the Court

of Appeals for the Fourth Circuit recently reiterated:

> Under the *McDonnell Douglas* three-step framework, the plaintiff-employee must first prove a prima facie case of discrimination by a preponderance of the evidence. If she succeeds, the defendant-employer has an opportunity to present a legitimate, non-discriminatory reason for its employment action. If the employer does so, the presumption of unlawful discrimination created by the *prima facie* case drops out of the picture and the burden shifts back to the employee to show that the given reason was just a pretext for discrimination.

*Mackey v. Shalala*, 360 F.3d 463, 468 (4th Cir.2004), *quoting Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir.1996). To establish a prima facie case of racially hostile work environment, Plaintiff must demonstrate that: "(1) the harassment was unwelcome; (2) the harassment was based on his race or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998). Plaintiff has failed to satisfy the second and third of these elements because she has not demonstrated that the acts alleged to form the basis of the "hostile work environment" were based on her race.[10] Furthermore, Plaintiff has failed

---

9. Where, as here, a plaintiff presents circumstantial evidence of race discrimination, the elements required to show a viable cause of action are the same for both Title VII and § 1981. *Love–Lane v. Martin*, 355 F.3d 766, 786 (4th Cir.2004) (explaining that the legal standard is the same for claims brought simultaneously under Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983); *see also Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (applying Title VII analysis to claims brought under Section 1981).

10. Though the Court need not reach the issue in light of Plaintiff's failure to satisfy these elements, there is considerable doubt about whether Plaintiff has satisfied the fourth element. MetLife went to great lengths to investigate Ms. Gagnon's allegations and to correct the problems that they concluded were based on a personality clash between Ms. Gagnon and Plaintiff. Plaintiff has introduced no evidence to suggest that those measures were unreasonable.

to meet the high standard to establish that the discrimination was sufficiently "severe or pervasive" as to sustain a hostile work environment claim.

■ For actions giving rise to a "hostile work environment" to be "based on race," the plaintiff must present evidence that would prove a "direct or inferential connection between [the plaintiff's] allegations and her race." *Jackson v. State of Maryland*, 171 F.Supp.2d 532, 541 (D.Md.2001). The record in this case reveals no such connection. Wang has produced overwhelming evidence that demonstrates that she had personal grievances with Cindy Gagnon. The record is devoid, however, of any sufficient basis to support Plaintiff's allegation that Gagnon's actions toward her were motivated by racial animus.

Wang's main evidentiary support for her contention that Gagnon's actions were racially motivated is the testimony of Roy Brown, the former Managing Director of the American Office. Mr. Brown testified that Gagnon treated Plaintiff "worse than other agents," and made his own conclusion that race may have been a factor in Gagnon's issues of "control." (Pl.'s Mem. Opp. at 22.) Brown stated that this "control" was what really motivated Gagnon's mistreatment of Wang and the other FSR's. He also testified that *all of the agents* "disliked" and complained about Gagnon," and that "even the established agents complained about her licenses and contracts." (Brown Dep. at 54:22–55:11.) When he was specifically asked whether Ms. Gagnon's actions toward Plaintiff could have been motivated by race, Mr. Brown answered "I think I can't say that. I think that they were ... more driven by control ...." (Brown Dep. 42:5–19.) Taken together, Mr. Brown's statements reveal, at most, that Gagnon had control issues and that her competence was questionable.

Aside from Wang's own conclusory testimony on the subject, the record is devoid of any observational evidence that would suggest that Ms. Gagnon's actions were racially motivated. In fact, Plaintiff failed to adequately demonstrate that Gagnon's actions were even *intentional*, let alone motivated by racial hostility. Wang provided no response to specific documentary and testimonial evidence on the record that suggests that many of the "harassing actions" were mere oversights or administrative mix-ups that had nothing to do with Ms. Gagnon's attitude toward her.

Ms. Wang also insists that Gagnon's racial hostility is evinced by her own allegations that Gagnon treated her differently than her white co-workers. However, she has offered no specific proof of exactly who was treated differently and how. Indeed, the undisputed facts indicate that another Chinese FSR, Nancy Shaw, benefited from the alleged mistreatment of Wang. As Judge Motz of this Court recognized, "vague claims of differing treatment" by the plaintiff are insufficient to demonstrate disparate treatment. *See Jackson*, 171 F.Supp.2d at 541 (citing *Causey*, 162 F.3d at 801 (recognizing that the plaintiff's conclusory statements of differential treatment of similarly situated employees, without specific evidentiary support, cannot support an actionable claim for harassment); *Carter v. Ball*, 33 F.3d 450, 461–62 (4th Cir.1994) (holding that general allegation that a supervisor reprimanded African–American plaintiff publicly but spoke with his white co-workers in private does not establish an actionable claim of harassment without substantiation by accounts of specific dates, times or circumstances)). Wang has failed to show Gagnon's actions were racially motivated and her claim of a racially hostile work environment is therefore unavailing. *See Nicole v. Grafton School, Inc.*, 181 F.Supp.2d 475 (D.Md. 2002) (rejecting hostile work environment

claim under Title VII and § 1981 where African–American school employee failed to proffer any evidence that negative incidents involving supervisor were based on her race); *Settle v. Baltimore County,* 34 F.Supp.2d 969, 1003 (D.Md.1999) *aff'd sub nom. Harris v. Earp,* 203 F.3d 820, 2000 WL 51282 (4th Cir.2000); *Settle v. Baltimore County Police Dep't,* 203 F.3d 822, 2000 WL 51283 (4th Cir.2000) (rejecting allegations that the court deemed to be "racially neutral" because the record did not show that the alleged actions were racially motivated); *Porter v. Nat'l Con–Serv, Inc.,* 51 F.Supp.2d 656, 659 (D.Md. 1998) (refusing to consider co-worker's threat in hostile environment claim because there was no evidence that the threat was related to plaintiff's race).

■ Even if Wang could show that the alleged harassment was based on her race, her claim would still fail because she cannot meet the third essential element of a hostile work environment claim, that the "harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere." *Causey,* 162 F.3d at 801. The question of whether the degree of alleged hostility or abuse was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere actionable under §§ 1981 or Title VII is to be determined by examining the totality of the circumstances. *Spriggs v. Diamond Auto Glass,* 242 F.3d 179 (4th Cir.2001). The United States Court of Appeals for the Fourth Circuit has recognized the following factors to aid in the determination of pervasiveness: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with the plaintiff's work performance; and (5) what psychological harm, if any, resulted." *Conner v. Schrader–Bridgeport Intern., Inc.,* 227 F.3d 179, 193 (4th Cir.2000). In applying these factors, this Court has recognized that "[t]he standard for proving an abusive work environment is intended to be a very high one" [11] because the standard is designed to "filter out complaints attacking 'the ordinary tribulations of the workplace' ...." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

Taken together, Wang's complaints involve precisely the "ordinary tribulations of the workplace" that are not actionable under Title VII or § 1983. Plaintiff contends that the licensing delays, delays in transferring customer accounts, failure to transfer telephone calls, and other such administrative problems caused by Ms. Gagnon made it more difficult for her to sell financial products and thereby "altered the terms and conditions of her employment." Yet the record suggests that these frustrations were shared by many, if not all, of the other agents in the office. Moreover, this type of "sporadic" inconvenience is not sufficiently "severe or pervasive" to meet the demanding test to establish a hostile environment claim. *See Faragher,* 524 U.S. at 788, 118 S.Ct. 2275 (explaining the justification for the "demanding" requirements placed on hostile environment claims); *Nicole v. Grafton School,* 181 F.Supp.2d 475, 484 (D.Md. 2002) (granting motion to dismiss Title VII hostile environment claim in part because alleged racial slur was not sufficiently "continuous and prolonged"); *Jackson,* 171 F.Supp.2d at 532 (holding that plaintiff's allegations of "loosely related actions that she perceived to be hostile to her based on her race" are insufficient to meet the "heavy burden" required to prove hostile environment).

---

11. *Jackson,* 171 F.Supp.2d at 542.

Plaintiff has therefore failed to establish two of the requisite elements of a hostile work environment claim. Consequently, Defendant's Motion for Summary Judgment as to Count I will be granted.

## B. Count II–Gender Discrimination Under Title VII

Count II of Plaintiff's Complaint sets forth a hostile work environment and *quid pro quo* sexual harassment claim in violation of Title VII. Plaintiff's quid pro quo claim fails as a matter of law. However, there is a genuine issue of material fact as to whether the alleged sexual harassment constituted a hostile work environment.

The Supreme Court in *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), held that a claim of hostile environment sexual harassment is a form of sex discrimination that is actionable under Title VII. In recognizing hostile environment sexual harassment independent of *quid pro quo* sexual harassment, the Court explained for such harassment "to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of . . . employment and create an abusive working environment.'" *Id.* at 67, 106 S.Ct. 2399 (quoting *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). Subsequently, in the companion cases of *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), the Supreme Court addressed the scope of its opinion in *Meritor* with respect to an employer's vicarious liability in sexual harassment cases.[12]

In establishing standards for imposing vicarious liability upon employers in sexual harassment cases, the Court in *Burlington Industries* and *Faragher* reiterated the distinction between *quid pro quo* harassment and hostile work environment harassment. In *Burlington Industries,* the Court noted that, when there is a tangible employment action in *quid pro quo* actions, the employer is "subject to vicarious liability." 524 U.S. at 753, 118 S.Ct. 2257. The Court then specifically addressed the question of an employer's vicarious liability when there is no tangible action taken, but there is a sexually hostile work environment, stating:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence . . . The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

524 U.S. at 765, 118 S.Ct. 2257. This Court addressed the categories of *quid pro quo* sexual harassment and hostile work environment harassment in *Lewis v. Forest Pharmaceuticals Inc.,* 217 F.Supp.2d 638 (D.Md.2002) and *Rachel–Smith v. FTData, Inc.,* 247 F.Supp.2d 734 (D.Md. 2003).

### 1. Quid Pro Quo Harassment

Applying these standards in the context of *quid pro quo* sexual harassment, the Fourth Circuit has recognized that "*quid*

---

**12.** *See discussion generally in Watkins v. Professional Security Bureau Ltd.,* 201 F.3d 439, 1999 WL 1032614 (4th Cir.1999) (unreported opinion affirming this Court).

*pro quo* sexual harassment can be established by a five-element prima facie case:" (1) "[t]he employee belongs to a protected group;" (2) she was "subject to unwelcome sexual harassment;" (3) "the harassment complained of was based upon sex;" (4) "[t]he employee's reaction to the harassment affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment;" and, (5) "the employer ... knew or should have known about the harassment and took no effective remedial action." *Spencer v. General Electric Co.*, 894 F.2d 651, 658 (4th Cir. 1990); *see also Lewis*, 217 F.Supp.2d at 646; *Rachel–Smith*, 247 F.Supp.2d at 745 (noting that *Spencer* was overruled on other grounds by *Farrar v. Hobby*, 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992)).

■ In the instant case, Plaintiff Wang has alleged a series of incidents involving her regional supervisor, David Mancini. As a woman and member of a protected class, Wang was subject to unwelcome sexual harassment that was certainly based upon sex. In addition, it is undisputed that Mancini was a "supervisor." Accordingly, "knowledge of the harassment" is imputed to MetLife through Mancini, its "agent-supervisor." *See Rachel–Smith*, 247 F.Supp.2d at 745–746; *Spencer v. General Electric*, 894 F.2d at 658 n. 10; 42 U.S.C. Sec.2000e(b). The precise question in this case is whether Wang's reaction to Mancini's harassment affected tangible aspects of her compensation, terms, condition or privileges of her employment to satisfy the fourth element of the five part test set forth in *Spencer*, 894 F.2d at 658.

Wang has failed to establish any connection between her rejection of Mr. Mancini's sexual overtures and her termination. Plaintiff does not contend that Mancini ever actually threatened to take "tangible employment actions" against her for rebuffing his sexual overtures. Further, the record reflects that no such action was taken. Mancini never docked Plaintiff's pay, forced her to work in degrading positions, etc. To the contrary, Plaintiff contends that Mancini helped her obtain better assignments.

The fact that Plaintiff was terminated, standing alone, does not demonstrate a tangible *quid pro quo* action. The termination occurred nine months after Plaintiff's last encounter with Mancini. While Plaintiff does offer evidence to suggest that the termination may have been related to her complaints about Ms. Gagnon, she has offered no evidence that the termination related in any way to the sexual harassment by David Mancini.

Plaintiff has therefore failed to establish the final element to a prima facie case of *quid pro quo* sexual harassment and there is no genuine issue of material fact with respect to this category of gender discrimination.

### 2. *Hostile Work Environment Harassment*

■ To demonstrate a prima facie case of hostile work environment sexual harassment, Wang must show: "(1) that she was subjected to unwelcome conduct; (2) the unwelcome conduct was based on sex; (3) it was sufficiently pervasive or severe to alter the conditions of employment and to create a hostile work environment; and (4) some basis exists for imputing liability to the employer." *Rachel–Smith v. FTData, Inc.*, 247 F.Supp.2d 734, 749 (D.Md.2003) (Citing *Smith v. First Union Nat'l Bank*, 202 F.3d 234 (4th Cir.2000)).

■ Preliminarily, Defendant claims that Wang's claims are time-barred under the limitations provisions of Title VII. Because Maryland law prohibits the gender-based discrimination alleged by Plaintiff, Plaintiff had 300 days from the occurrence of the last discriminatory act to file a charge with the EEOC under Title VII.

*See* 42 U.S.C.2000e–5(e)(1); *Williams v. Giant Food Inc.*, 370 F.3d 423, 428 (4th Cir.2004) (explaining the extended 300–day time period to file a Title VII action occurs when, as here, state law prohibits the alleged employment practice) (*citing Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 439 (4th Cir.1998)); *Jackson,* 171 F.Supp.2d at 545 (applying 300–day limitation period to gender discrimination claims occurring in Maryland). Any incidents occurring prior to this limitation period "are time-barred unless they can be related to a timely incident as a 'series of separate but related acts' amounting to a continuing violation." *Beall v. Abbott Labs.*, 130 F.3d 614, 620 (4th Cir.1997) (quoting *Jenkins v. Home Ins. Co.*, 635 F.2d 310, 312 (4th Cir.1980) (per curiam)).

All of the direct acts of alleged sexual harassment in this case occurred in the years of 2000 and 2001. Wang acknowledged that her last direct contact with Mr. Mancini was on July 28, 2001. (Wang Dep. at 524:1–3; 580:22–581:5; 586:8–11.) She also concedes that this contact falls outside of the statutory 300–day period. However, Plaintiff argues that, despite the lack of direct contact, Mancini continued his pattern of harassment by virtue of his status as the ultimate arbiter over Plaintiff's employment. Plaintiff suggests that Mancini's "continuing violations" extended into the 300–day period therefore rendering the claims timely.

■ Plaintiff's theory is correct in light of the facts on the record and the relevant legal standards. The Fourth Circuit has recently recognized that "a Title VII plaintiff seeking to recover for a hostile work environment can recover for acts occurring even beyond [the 300–day period], as long as at least a portion of the hostile work environment occurred within the relevant limitations period." *White v. BFI Waste Services, LLC*, 375 F.3d 288, 292–293 (4th Cir.2004). Plaintiff has presented suffi-

cient evidence to create a triable question as to whether "at least a portion" of Mancini's pattern of sexual harassment occurred within the 300–day window. *See id.* Even after his last contact with Plaintiff Wang, Mancini continued to oversee Wang's complaints against Ms. Gagnon. Moreover, Mancini signed the ultimate termination notification, and he was at least involved in the deliberations leading to her termination. Additionally, Mancini's subordinates instructed her not to complain about his conduct as late as April 8, 2002. (*See* Wang Dep. at 619:9–11.) According Plaintiff every favorable inference, Mancini's involvement in her employment could form part of the "hostile work environment" created by his alleged harassment. As such, the actions are not time-barred for purposes of summary judgment. *See White*, 375 F.3d at 292–293; *Beall v. Abbott Laboratories*, 130 F.3d 614, 620 (4th Cir.1997) (the "pattern of hostile work environment outside of the statutory window are not time-barred if they can be related to a timely incident as a 'series of separate but related acts' amounting to a continuing violation.").

Turning to the substantive elements of the prima facie case, Wang's allegations clearly satisfy the first three elements constituting a hostile work environment. Ms. Wang has demonstrated that she was harassed because of her gender and that such harassment was unwelcome. Moreover, the conduct alleged by Ms. Wang is "sufficiently severe or pervasive" to create an abusive environment established by the Supreme Court in *Meritor*, 477 U.S. at 66, 106 S.Ct. 2399. In addition, the series of incidents alleged by Ms. Wang creates "an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *see also Rachel–Smith,* 247

F.Supp.2d at 749 (the "sexually objectionable environment" must be both subjectively and objectively offensive).

In this case, the alleged conduct was both "objectively and subjectively" objectionable. The alleged harassment encompassed almost the entire period during which Plaintiff was employed. Wang alleges that Mancini kissed her on several occasions, and made other unwanted physical contacts with her. He also persisted in making his sexual advances after Plaintiff clearly rebuffed the advances. Plaintiff suffered physical and emotional trauma in response to these advances. Consequently, the alleged conduct was sufficiently offensive as to create an abusive environment from the perspective of a reasonable person.

■ Defendant mainly argues that Wang cannot meet the final element of the prima facie case because MetLife contends that it has established the affirmative defense to liability noted in the Supreme Court's opinion in *Burlington Industries*, 524 U.S. at 765, 118 S.Ct. 2257. Defendant claims that it has established this defense as a matter of law because MetLife: (1) "exercised reasonable care to prevent and correct promptly any harassing behavior;" and (2) Plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." (Def.'s Mem. Supp. Mot. Summ. J. at 39.) However, the facts of this case reveal genuine issues of material fact regarding both of the elements of the imputation of liability defense.

First, there are triable factual questions as to whether MetLife exercised reasonable care to prevent and/or correct Mancini's conduct. Plaintiff Wang claims that she reported the alleged conduct to a MetLife manager, who failed to take any action in response. Moreover, her attempt to report Mancini's conduct was rebuffed by other MetLife executives at the April 2002 meeting. These facts present a factual dispute as to whether MetLife's actions were reasonable under the circumstances that must be resolved by the trier of fact at trial.

Second, there are fact questions concerning the adequacy of Wang's attempt to use MetLife's policies to remedy the harassment. Mr. Mancini was the Regional Vice President responsible for Plaintiff's Office and all of the offices in the region. As such, he oversaw virtually every personnel decision at all of the various offices. In particular, Mancini was the person ultimately responsible for the disposition of discrimination complaints. For instance, Mancini ultimately signed off on the report concerning Plaintiff's complaint against Ms. Gagnon.

Furthermore, Wang has presented evidence that Mancini's unique position prevented her from initiating the ordinary complaint process. Plaintiff contends that the Northern Virginia manager to whom she relayed the details of the harassment was too afraid of reprisals to act. (*See* Wang Dep. at 541–542.) In addition, both of the MetLife employees who attended the April 2002 meeting rebuffed Plaintiff's attempt to make any complaint concerning the Mancini. Under these circumstances, Plaintiff's failure to follow MetLife's prescribed procedures is arguably justified and the "reasonableness" of her actions is a fact question that is not appropriate for summary judgment. *See White*, 375 F.3d at 299. Accordingly, Defendant's Motion for Summary Judgment on Count II is denied with respect to hostile work environment sexual harassment.[13]

---

13. In light of the foregoing discussion, Plaintiff will proceed on this theory alone. Plaintiff may not proceed on the *quid pro quo* theory.

## C. *Count III–Retaliation*

Plaintiff's final Count asserts that she was terminated in retaliation for engaging in protected activity. As Plaintiff has presented no direct evidence of retaliation, she must rely upon the framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir.1989). Under *McDonnell Douglas*, Plaintiff must first establish a prima facie case of retaliation, whereupon the burden shifts to the employer to establish a legitimate non-retaliatory reason for the action. *Id.* If Defendant MetLife sets forth a legitimate, non-retaliatory explanation for the action, Plaintiff then must show that the employer's proffered reasons are pretextual, or her claim will fail. *Id.* Plaintiff can offer proof of pretext by showing that the "explanation is 'unworthy of credence' or by offering other forms of circumstantial evidence sufficiently probative of [retaliation]." *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir.2004) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

▮▮▮ To prove a prima facie case of retaliation,[14] Plaintiff must show that (1) she engaged in a legally-protected activity; (2) an adverse employment action was taken against her; and (3) there was a casual connection between the first two elements. *Dowe*, 145 F.3d at 656; *Spriggs*, 242 F.3d at 190.

Plaintiff has established the first two of these elements.[15] She suffered an adverse employment action when she was termi-

nated. *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 258 (4th Cir.1998) (holding that termination is an adverse employment action). Moreover, Plaintiff filed a formal complaint with MetLife Human Resources alleging racial harassment by Ms. Gagnon on March 14, 2001. Plaintiff alleges that she complained again about the same type of conduct on April 8, 2002. Although the formal complaint was investigated and no racial motive was found, the informal follow-up complaint was, nevertheless, a "protected activity." *Cf. Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277, 298 (4th Cir.2004) (recognizing that complaint to supervisor could constitute protected activity where employer was made aware of such complaint).

▮▮▮ The question of whether Plaintiff has sufficiently established the third element of the prima facie case-the causal connection-is a much closer question. Plaintiff contends that the element is satisfied because her termination closely followed her April 2002 complaint. Less than one month after she made her informal complaint, she was terminated. The termination decision was made in part by the same manager, Mr. Kinigopolous, who heard the complaints. Supporting Plaintiff's position is Fourth Circuit authority which recognizes that knowledge of an employee discrimination complaint, combined with the temporal proximity of the complaint and the termination, is sufficient to establish the "less onerous burden" of proving causal connection for the purpose of establishing a prima facie case. *See Price v. Thompson*, 380 F.3d 209, 212 (4th

---

**14.** The opinions of the U.S. Court of Appeals for the Fourth Circuit in *Dowe v. Total Action Against Poverty*, 145 F.3d 653 (4th Cir.1998) and, *Spriggs v. Diamond Auto Glass*, 242 F.3d 179 (4th Cir.2001), clearly establish that the Title VII and Section 1981 analysis for retaliation are the same.

**15.** As previously discussed, there is no connection between the termination and the alleged sexual harassment, and Plaintiff has therefore failed to establish a prima facie case of retaliation with regard to the sexual harassment allegations.

Cir.2004) (recognizing this principle in the failure to hire context); *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir.1994) (finding four-month separation between filing of charges and employee's termination sufficient to establish *prima facie* case); *Williams v. Cerberonics*, 871 F.2d 452, 457 (4th Cir. 1989) (showing that firing occurred three months after filing of discrimination complaint was sufficient to establish causation).

However, the facts of this case make application of those principles questionable, at best. Plaintiff made numerous informal complaints about Gagnon. Moreover, she made a formal complaint alleging discrimination more than a year prior to her termination. There is no evidence before this Court that MetLife ever disciplined or retaliated against Plaintiff in any way for those complaints. There is no authority to suggest that the temporal proximity is sufficient under these facts.

■■■ Even if this Court were to find that Plaintiff could establish the third element of the prima facie case for retaliation, Plaintiff's claim is unavailing because Plaintiff has failed to establish that MetLife's "legitimate, non-discriminatory reason" for terminating her is mere pretext. Defendant MetLife has documented the actual complaints concerning Plaintiff Wang's job performance that were received by management, and the steps that management took to investigate those complaints. Wang does not appear to contest the essential facts that give rise to the complaints. Though she denies ever having cursed at her former customer, Wang does not deny the fact that she confronted the customer and that she spoke ill of her co-workers. Additionally, Plaintiff has not denied the fact that other co-workers (all of whom were Chinese–American) asserted various complaints against her. There is no dispute that both of these infractions are violations of MetLife policy which enti-tled MetLife to terminate Plaintiff immediately.

Nonetheless, Plaintiff contends that the termination was a mere "pretext" because other similarly-situated employees were treated less severely. Plaintiff relies entirely on David Mancini's deposition testimony in support of this theory. First, she suggests that Mancini testified that no MetLife employee has ever been terminated for an infraction such as the complaints alleged against Wang. (Pl's Mem. Opp. at 19 (citing Mancini Dep. at 35, 40–42).) Second, Plaintiff contends that Mancini's testimony reveals that customer complaints were alleged against other MetLife employees, and that those employees were never fired. (Pl's Mem. Opp. at 1–19 (citing Mancini Dep. at 32–37).) However, this evidence is of no value in determining whether MetLife's proffered reasons for termination are pretextual. Plaintiff failed to submit information about the types of employee complaints involved, the level of the employees and other circumstances that would be required before any reliable comparison could be drawn between the employees cited in the Mancini testimony and Wang. Plaintiff is required to present sufficient evidence to demonstrate that MetLife's proffered reason for its termination decision was *false*-that requirement is more demanding than a showing that the decision was somehow mistaken. *Price*, 380 F.3d at 216–17. Plaintiff has offered no evidence that would support an inference of falsity. As a consequence, her retaliation claim fails as a matter of law. *See Price*, at 216–17 (affirming grant of summary judgment where job applicant failed to offer probative evidence of falsity and therefore did not show pretext); *Rowe v. Marley Co.*, 233 F.3d 825, 830–31 (4th Cir.2000) (affirming grant of summary judgment and concluding plaintiff had not "forecast any evidence that casts doubt on the veracity of [the employer's] proffered

explanation for his termination."). Defendant's Motion for Summary Judgment on Count III is therefore granted.

## IV. *CONCLUSION*

For the foregoing reasons, Defendant's Motion for Summary Judgment will be GRANTED as to Count I (race discrimination) and Count III (retaliation), and DENIED as to Count II (gender discrimination) with regard to hostile work environment sexual harassment.

## *ORDER*

For the reasons stated in the foregoing Memorandum Opinion, IT IS this 14th day of September 2004, HEREBY ORDERED:

1. That Defendant's Motion for Summary Judgment (Paper No. 19) is GRANTED as to Count One (race discrimination) and Count Three (retaliation) of Plaintiff's Complaint;

2. That Defendant's Motion for Summary Judgment is DENIED as to Count Two (gender discrimination);

3. That judgment be ENTERED in favor of Defendant against Plaintiff with respect to Counts One and Three; and

4. That the Clerk of the Court transmit copies of this Order and accompanying Memorandum Opinion to counsel for the parties.